805 A.2d 1040

## ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

### Bradford Jay BARNEYS.

**Misc. AG No. 2, Sept. Term, 2001.**

Court of Appeals of Maryland.

Aug. 28, 2002.

Melvin Hirshman, Bar Counsel, Raymond A. Hein, Assistant Bar Counsel for Attorney Grievance Commission of Maryland, for petitioner.

Bradford Jay Barneys, Washington, DC, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, Judge.

The Attorney Grievance Commission of Maryland, Petitioner, acting through Bar Counsel and at the direction of the Review Board, *see* Maryland Rule 16–709,[1] filed a Petition for Disciplinary Action against Bradford Jay Barneys, Respon-

---

1. The public charges in this case were filed and pending before this Court prior to 1 July 2001; thus, we refer to the attorney grievance procedural rules in effect prior to 30 June 2001. The then applicable rule, 16–709(a), states that "[c]harges against an attorney shall be filed by the Bar Counsel acting at the direction of the Review Board." Such filings now are governed by Rule 16–751(a), which was adopted 30 November 2000, effective 1 July 2001, and provides as follows:

 **Commencement of disciplinary or remedial action.**
 Upon approval of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.

dent, charging him with misconduct, as defined by Rule 16–701(k),[2] in connection with his alleged unauthorized practice of law in Maryland. Specifically, the petition alleged that Respondent violated the following Maryland Rules of Professional Conduct ("MRPC"), as adopted by Maryland Rule 16–812: 5.5(a) (Unauthorized practice of law);[3] 7.5(a), (b), and (d) (Firm names and letterheads);[4] 4.1 (Truthfulness in state-

---

**2.** Maryland Rule 16–701(k) states:

> **Misconduct.**—"Misconduct" means an act or omission by an attorney, individually or in concert with any other person or persons which violates the Maryland Rules of Professional Conduct, as adopted by Rule 16–812, whether or not the act or omission occurred in the course of an attorney-client relationship.

Effective 1 July 2001, the definition of "professional misconduct" is codified at Maryland Rule 16–701(i), which adopts "the meaning set forth in Rule 8.4" as adopted by Rule 16–812. Professional misconduct "includes the knowing failure to respond to a request for information authorized by this Chapter without asserting, in writing, a privilege or other basis for such failure." *See* Rule 16–701(i).

**3.** MRPC 5.5(a) provides that a lawyer shall not "practice law in a jurisdiction where doing so violates the regulation of the legal profession in that jurisdiction."

**4.** As relevant, MRPC 7.5 provides:

> (a) A lawyer shall not use a firm name, letterhead or other professional designation that violates Rule 7.1 [(Communications concerning a lawyer's services)]. A trade name may be used by a lawyer in private practice if it does not imply a connection with a government agency or with a public or charitable legal services organization and is not otherwise in violation of Rule 7.1.
>
> (b) A law firm with offices in more than one jurisdiction may use the same name in each jurisdiction, but identification of the lawyers in an office of the firm shall indicate the jurisdictional limitations on those not licensed to practice in the jurisdiction where the office is located.
>
> . . . .
>
> (d) Lawyers may state or imply that they practice in a partnership or other organization only when that is the fact.

MRPC 7.1 provides:

> A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it:
>
> (a) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading;

ments to others);[5] 8.1(a) (Bar admission and disciplinary matters);[6] and 8.4(b), (c), and (d) (Misconduct),[7] as well as Maryland Code (1989, 2000 Repl.Vol.), Business Occupations and Professions Article, §§ 10–601[8] and 10–602[9].

---

(b) is likely to create an unjustified expectation about results the lawyer can achieve, or states or implies that the lawyer can achieve results by means that violate the rules of professional conduct or other law; or

(c) compares the lawyer's services with other lawyers' services, unless the comparison can be factually substantiated.

5. MRPC 4.1 provides:

(a) In the course of representing a client a lawyer shall not knowingly:

(1) make a false statement of material fact or law to a third person; or

(2) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client.

(b) The duties stated in this Rule apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.

6. MRPC 8.1(a) provides that "[a]n applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter," shall not "knowingly make a false statement of material fact."

7. In pertinent part, MRPC 8.4 provides that "[i]t is professional misconduct for a lawyer to:

. . . .

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice . . . ."

8. Maryland Code (1989, 2000 Repl.Vol.), Business Occupations and Professions Article, § 10–601, as relevant, provides that "[e]xcept as otherwise provided by law, a person may not practice, attempt to practice, or offer to practice law in the State unless admitted to the Bar."

9. Maryland Code (1989, 2000 Repl.Vol.), Business Occupations and Professions Art., § 10–602, provides:

Unless authorized by law to practice law in the State, a person may not represent to the public, by use of a title, including "lawyer", "attorney at law", or "counselor at law", by description of services,

We referred the case to the Honorable Michael P. Whalen of the Circuit Court for Prince George's County to conduct a hearing and to make findings of fact and draw conclusions of law. *See* Rule 16–711(a).[10] Following a one day hearing on 13 July 2001, the hearing judge made findings of fact from which he concluded that Respondent committed each of the charged violations. Petitioner filed no exceptions to the findings of fact and conclusions of law. It recommends disbarment as the sanction to be imposed. Respondent, while not disputing that he engaged in the unauthorized practice of law, took one exception to the fact finding and recommended as a sanction that he be barred from applying for admission to the Maryland Bar for two years.[11]

I.

From the evidentiary record below, the hearing judge, in a memorandum dated 5 September 2001, found that Respondent, a member of the Bars of New York, Connecticut, and the District of Columbia, held himself out as a Maryland attorney beginning in August of 1996, when he opened an office at 7505 New Hampshire Avenue, Suite 301, Langley Park, Maryland. Without noting any jurisdictional limitation on the practice, Respondent used the name "Law Offices of Bradford J. Barneys, P.C." on his letterhead and business cards. The hearing court also found as a fact that, without being admitted to the Maryland Bar, Respondent engaged in the practice of law in

methods, or procedures, or otherwise, that the person is authorized to practice in the State.

**10.** Rule 16–711(a) provides that "[a] written statement of the findings of facts and conclusions of law shall be filed in the record of the proceedings and copies sent to all parties." *See also* Rule 16–757(c), effective 1 July, 2001 (providing further details on how to file a statement of findings and conclusions).

**11.** Respondent applied on 30 May 1997 for admission to the Maryland Bar as an out-of-state attorney. The premise of that application was that, although he resided in Maryland, he practiced law in the District of Columbia at the time. With regard to the pending application, Respondent apparently proposes to withdraw it "with prejudice."

Maryland during 1997 and 1998. The hearing court further determined that, despite the known pendency of Respondent's Maryland bar admission application (*see supra* note 11), he nonetheless entered his appearance as counsel and otherwise represented clients in at least five cases in the District Court of Maryland, sitting in Prince George's County, and the Circuit Court for Prince George's County. In none of these cases had Respondent been either admitted to the Maryland Bar or admitted specially by the court.

The hearing judge further found that, of special note, Respondent engaged in the unauthorized practice of law in the case of *State of Maryland v. Santiago Sanchez*, CT980986X.[12] There, Respondent entered his appearance and filed other papers. He also contacted Gates Bail Bonds to arrange for Mr. Sanchez's one hundred fifty thousand dollars bond. Specifically, Respondent proposed that Deborah Gates, on behalf of Gates Bail Bonds, "accept an assignment of Mr. Sanchez's worker's compensation settlement proceeds, promising future payment in the amount of Fifteen Thousand Dollars," because the settlement agreement already existed and the funds would be available within thirty days. When Ms. Gates agreed to the assignment, Respondent gave her a document printed on his letterhead and captioned, "Assignment of Settlement Proceeds," which was signed by Respondent and purportedly by Mr. Sanchez. In that document, Respondent committed "to observe all terms of [the assignment agreement] and ... to withhold such funds from any settlement, judgment or verdict as may be necessary to adequately protect Gates Bail Bonds."

Furthermore, notwithstanding Respondent's agreement to withhold funds from the proceeds of Mr. Sanchez's worker's compensation case, Judge Whalen found that Martin Gerel, Esquire, of the law firm of Ashcraft & Gerel, not Respondent, represented Mr. Sanchez in that case. The hearing judge also determined that, although Respondent did not state affirma-

---

12. Respondent admitted to Petitioner's investigator on 5 February 1999 that he had engaged in the unauthorized practice of law in Mr. Sanchez's case, but denied representing any other client in Maryland.

tively to Ms. Gates that he represented Mr. Sanchez in the worker's compensation case, Respondent lead her to believe that he did. In any event, Mr. Gerel, never having been informed by Respondent of the assignment, did not contact Ms. Gates before disbursing to Mr. Sanchez his share of the worker's compensation proceeds. Mr. Sanchez neither contacted Ms. Gates upon his release from jail nor appeared for trial. As a result, Gates Bail Bonds was not paid its fee and the bond posted by Gates Bail Bonds was forfeited.

Investigating Ms. Gates' complaint against Respondent, one of Petitioner's investigators, Mr. Peregoy, visited the building in which Respondent's office was located on 19 November 1998, finding a lobby sign describing Barneys as an "attorney at law" and "a law office sign in Respondent's name outside his suite." In response to Petitioner's subsequent letter apprising him of the Gates' complaint and threatening to seek an injunction unless he closed his Langley Park Office, Respondent agreed in a reply letter of 12 December to close his practice on New Hampshire Avenue, including removing the sign outside his suite door. The removal of the suite sign was confirmed by the investigator during a second visit to the building on 28 December 1998. Respondent later removed his business cards from open view and availability, although the lobby sign had not been removed, as of 22 January 1999, the date of the investigator's third visit to Respondent's Maryland office.

As indicated, on these findings, the hearing judge concluded that Respondent committed each of the rule violations charged. With respect to the MRPC 4.1 violation, Judge Whalen's determination depended on crediting Ms. Gates' belief that Respondent represented Mr. Sanchez in the worker's compensation case and, in particular, on whether she was justified in so believing. Concluding that Respondent "held out to Ms. Gates of Gates Bail Bonds, that he represented Mr. Sanchez in the worker's compensation case," the hearing judge reasoned that "[R]espondent's conversations and actions led Ms. Gates to believe that he in fact represented Mr. Sanchez on his worker's compensation case. Her belief that Respon-

dent represented Mr. Sanchez and could disburse the settlement proceeds, led her to post bond on behalf of Mr. Sanchez."

The MPRC 8.1(a) violation was premised on three factual findings: that Respondent made a false statement on his Petition for Admission to the Maryland Bar—representing that he practiced only in the District of Columbia, when he actually had an office in Maryland and was engaging in the unauthorized practice of law; that Respondent told Petitioner's investigator that he had only one Maryland client; and that Respondent entered his appearance, without special permission and while not a Maryland lawyer, in the cases of clients other than Mr. Sanchez, and otherwise represented those clients.[13] As to the MRPC 8.4(b), (c), and (d) violations, the hearing judge stated the basis for his conclusion that Respondent also committed those violations, as follows:

Respondent was less than truthful with Ms. Gates and led her to believe that he had the ability to disburse the settlement proceeds. Moreover, Respondent was deceitful and dishonest to the judges of the District and Circuit Courts of Prince George's County by entering his appearance on behalf of clients when he knew that he was not authorized to practice law in the state of Maryland.

. . . .

Although Petitioner did not allege with specificity what conduct Respondent engaged in to violate this subsection of 8.4[(d)], the Court finds that the overall conduct of Respondent as detailed in the Findings of Fact shows that Respondent's conduct was prejudicial to the administration of justice.

The hearing judge further noted in his conclusions of law that Respondent did not dispute "that he violated [MRPC] 5.5(a)" and [MRPC] 7.5[(a), (b), and (d)], and "admitted his

---

13. Respondent does not dispute this finding. He admits that he entered his appearance in five cases in Maryland and represented those clients here, while neither admitted to the Maryland Bar nor specially admitted for the purpose.

violations of §§ 10–601 and 10–602 of the Business Occupations and Professions Article of the Maryland Code."

Petitioner took no exceptions to the findings of fact or conclusions of law. The recommendation for sanction filed by Petitioner seeks Respondent's disbarment.[14] In support of that recommendation, Petitioner reminds us of our decision in *Attorney Grievance Comm'n v. Harper and Kemp,* 356 Md. 53, 70, 737 A.2d 557, 566 (1999), where we stated that "unadmitted attorneys must be deterred from attempting to practice law in violation of the statutory prohibition against unauthorized practice." Petitioner asserts that there is "no reasonable basis" on which Respondent "could have thought that his conduct was lawful." Petitioner also cites the various instances of misrepresentation in which the hearing judge found Respondent engaged. In summary, citing our decision in *Attorney Grievance Comm'n v. Johnson,* 363 Md. 598, 770 A.2d 130 (2001), Petitioner argues:

> The Respondent has displayed a total absence of respect for the law by his conduct in this matter. In addition to the unauthorized practice of law, he repeatedly engaged in other conduct involving dishonesty, fraud, deceit and misrepresentation. For such conduct, the appropriate sanction is disbarment.

---

14. Although Respondent is not admitted to practice before the Bar of Maryland and even though he has not raised a jurisdictional challenge, the Maryland Rules make clear that he is subject to the discipline of this Court. With respect to the disciplinary authority of this Court, MRPC 8.5(b) provides as follows:

> A lawyer not admitted by the Court of Appeals to practice in this State is subject to the disciplinary authority of this State for conduct that constitutes a violation of these Rules and that:
>
> (1) involves the practice of law in this State by that lawyer, or
>
> (2) involves that lawyer holding himself or herself out as practicing law in this State. . . .

Rule 16–701(a) defines an attorney for purposes of discipline or inactive status as including "a member of the bar of any other state, district, or territory of the United States who engages in the practice of law in this State, or who holds himself or herself out as practicing law in this State, or who has the obligation of supervision or control over another attorney who engages in the practice of law in this State."

Respondent took exception only to one of the hearing judge's findings, namely, that Respondent was untruthful about the full extent of his representation of clients in Maryland when responding to Petitioner's investigator's inquiries on the subject. Respondent filed a Recommendation for Sanctions asserting that the appropriate punishment for his conduct is a two-year prohibition against re-filing an application for admission to the Maryland Bar. Acknowledging that he engaged in the unauthorized practice of law, Respondent posits, nonetheless, that his conduct did not rise to the level of that confronting this Court in *Harper and Kemp*. He asserts that his violation of MRPC 5.5(a) was not a "deliberate and persistent" violation, as was committed in *Harper and Kemp;* rather, he now maintains, "even though [his] office was in Maryland, [he] primarily represented clients before the courts of the District of Columbia with the exception of the representation of five clients whom [he] represented in the Maryland Courts." Moreover, Respondent notes his cooperation with Petitioner, pointing specifically to his voluntary closure of the Maryland office without requiring Petitioner to obtain an injunction for that purpose and his relocation of the office in early 1999 to the District of Columbia, where he has operated ever since. Further, Respondent expresses his remorse, stating as follows:

> Respondent is deeply remorseful for his conduct in this case and has no prior disciplinary record in any jurisdiction. When Respondent opened his office in Maryland, Respondent was a new solo practitioner and was not aware of the prohibition of operating a law office in Maryland even where the primary law practice was in the District of Columbia. Respondent, however, was fully aware of the prohibition of entering his appearance in the Maryland Courts. For that, Respondent believes he should be punished. However, the appropriate sanction is not disbarment but rather an Order preventing Respondent from applying for admission to the Maryland Bar for a period of two years.

 Other than asserting that he excepted to one of the hearing judge's factual findings and stating the point of dis-

agreement, Respondent presented absolutely no argument in support of the exception. Failure to present argument in support of an exception is a sufficient basis on which to overrule the exception or, at least, not consider it.

Perhaps Respondent's failure to argue more expansively in support of his exception is explained by his recognition that, in attorney discipline cases, we review the findings of the hearing judge to determine whether they are based on clear and convincing evidence, *see Attorney Grievance Comm'n v. Powell,* 328 Md. 276, 287, 614 A.2d 102, 108 (1992); *Attorney Grievance Comm'n v. Clements,* 319 Md. 289, 298, 572 A.2d 174, 179 (1990), and that the "hearing court's findings of fact are *prima facie* correct and will not be disturbed unless they are shown to be clearly erroneous." *Attorney Grievance Comm'n v. Garland,* 345 Md. 383, 392, 692 A.2d 465, 469 (1997) (citing *Attorney Grievance Comm'n v. Goldsborough,* 330 Md. 342, 347, 624 A.2d 503, 505 (1993)). Here, there certainly is sufficient evidence in the record to support the hearing judge's finding that Respondent misrepresented to Petitioner's investigator the number of clients on whose behalf he was engaged, or had been engaged, in the unauthorized practice of law. Consequently, the finding is far from clearly erroneous.

## II.

The purpose of the sanction imposed on an attorney following disciplinary proceedings is the same as for the proceedings themselves, which is well settled and often stated by this Court: to protect the public rather than to punish the attorney who engages in misconduct. *See Attorney Grievance Comm'n v. Jeter,* 365 Md. 279, 289, 778 A.2d 390, 396 (2001); *Attorney Grievance Comm'n v. Tolar,* 357 Md. 569, 584, 745 A.2d 1045, 1053 (2000); *Attorney Grievance Comm'n v. Myers,* 333 Md. 440, 446, 635 A.2d 1315, 1318 (1994); *Goldsborough,* 330 Md. at 364, 624 A.2d at 513; *Attorney Grievance Comm'n v. Protokowicz,* 329 Md. 252, 262, 619 A.2d 100, 105 (1993); *Attorney Grievance Comm'n v. Hamby,* 322 Md. 606,

611, 589 A.2d 53, 56 (1991); *Attorney Grievance Comm'n v. Myers,* 302 Md. 571, 580, 490 A.2d 231, 236 (1985); *Attorney Grievance Comm'n v. Velasquez,* 301 Md. 450, 459, 483 A.2d 354, 359 (1984); *Attorney Grievance Comm'n v. Montgomery,* 296 Md. 113, 119, 460 A.2d 597, 600 (1983). As a result, this Court has firmly established the importance of sanctions in deterring attorneys from violating the disciplinary rules. *See Goldsborough,* 330 Md. at 364, 624 A.2d at 513; *Protokowicz,* 329 Md. at 262–63, 619 A.2d at 105. As we explained in *Attorney Grievance Comm'n v. Garfield,*

> [t]he public interest is served when this Court imposes a sanction which demonstrates to members of this legal profession the type of conduct that will not be tolerated. By imposing such a sanction, this Court fulfills its responsibility to insist upon the maintenance of the integrity of the Bar and to prevent the transgression of an individual lawyer from bringing its image into disrepute. Therefore, the public interest is served when sanctions designed to effect general and specific deterrence are imposed on an attorney who violates the disciplinary rules.

369 Md. 85, 98, 797 A.2d 757, 764 (2002) (quoting *Attorney Grievance Comm'n v. Dunietz,* 368 Md. 419, 428, 795 A.2d 706, 711 (2002) (internal quotations omitted) (quoting *Attorney Grievance Comm'n v. Wallace,* 368 Md. 277, 289, 793 A.2d 535, 542–43 (2002) (citations omitted))). *See also Attorney Grievance Comm'n v. Lane,* 367 Md. 633, 642, 790 A.2d 621, 626 (2002); *Attorney Grievance Comm'n v. Harris,* 366 Md. 376, 405, 784 A.2d 516, 532–33 (2001); *Attorney Grievance Comm'n v. Zdravkovich,* 362 Md. 1, 31–32, 762 A.2d 950, 966 (2000). " 'Of course, what the appropriate sanction for the particular misconduct is, in the public interest, generally depends upon the facts and circumstances of the case,' " *Garfield,* 369 Md. at 98, 797 A.2d at 764 (quoting *Dunietz,* 368 Md. at 428–29, 795 A.2d at 711 (citation omitted)), and " 'tak[es] account of any particular aggravating or mitigating factors.' " *Id.* (quoting *Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 484, 671 A.2d 463, 481 (1996) (citing *Attorney Grievance Comm'n v. Myers,* 333 Md. 440, 447, 635 A.2d 1315, 1318 (1994))).

## A.

## Unauthorized Practice of Law (MRPC 5.5(a))—The Flagship Violation

Our research reveals six relatively recent cases dealing with attorneys whose flagship violations were of MRPC 5.5(a) (the prohibition against unauthorized practice of law). In five of those cases, the attorney was disbarred. *See Attorney Grievance Comm'n v. Johnson,* 363 Md. 598, 770 A.2d 130 (2001); *Attorney Grievance Comm'n v. Briscoe,* 357 Md. 554, 745 A.2d 1037 (2000); *Attorney Grievance Comm'n v. Harper and Kemp,* 356 Md. 53, 737 A.2d 557 (1999); *Attorney Grievance Comm'n v. James,* 355 Md. 465, 735 A.2d 1027 (1999); *Attorney Grievance Comm'n v. Kennedy,* 319 Md. 110, 570 A.2d 1243 (1990). In the remaining case, *Attorney Grievance Comm'n v. Harris–Smith,* 356 Md. 72, 737 A.2d 567 (1999), the Court imposed a 30 day suspension. A review of these cases and a comparison with Respondent's case indicates that the present case has more in common with the cases that resulted in disbarment than the isolated result of the suspension in *Harris–Smith.* In addition, evidence of mitigation in this record, such as it is, is insufficient to suggest that disbarment is not the proper sanction here.

### 1. The Exception

In *Harris–Smith,* we concluded that Harris–Smith violated MRPC 5.5(a), 356 Md. at 85, 737 A.2d at 574, but identified at least two factual considerations not present in the prior unauthorized practice cases where disbarment was the typical result: (1) Harris–Smith did not represent clients in Maryland state court proceedings, and (2) Harris–Smith, who was admitted to the bar of the United States District Court for the District of Maryland, made some effort to conduct her practice in Maryland within the practice limits associated with her admission to the federal court. Harris–Smith was admitted to the bars in Pennsylvania and Virginia, as well as the Maryland federal court, and specialized in bankruptcy law. Between 1993 and 1995, she shared a practice in Landover, Maryland,

with three attorneys, two of whom were admitted to the Maryland Bar. The law firm promoted itself through radio and newspaper advertising. The radio advertisements "targeted those listeners for whom filing for bankruptcy was likely to be appropriate, yet it [sic] did not state that [Harris–Smith's] practice was limited to bankruptcy law and [the Maryland federal court]." *Harris–Smith*, 356 Md. at 76, 737 A.2d at 569. Harris–Smith's role in the law firm was to "prescreen" (a term she used) prospective clients. When she determined that a client's matter involved bankruptcy law, she proceeded to represent the client without the supervision of a Maryland attorney. When representation in a State court was required, however, she would refer the client to one of the firm's other attorneys admitted in Maryland.

Based on this conduct, we nonetheless found that Harris–Smith violated MRPC 5.5(a). In doing so, we rejected her defense that she "pinpointed" bankruptcy cases and therefore limited herself to federal legal matters. As we explained in a parenthetical, the "unauthorized practice of law includes '[u]tilizing legal education, training, and experience ... [to apply] the special analysis of the profession to a client's problem.'" *Harris–Smith*, 356 Md. at 83, 737 A.2d at 573 (alteration in original) (quoting *Somuah v. Flachs*, 352 Md. 241, 262, 721 A.2d 680, 690 (1998) (quoting *Kennedy v. The Bar Ass'n of Montgomery County*, 316 Md. 646, 662, 561 A.2d 200, 208 (1989))). In addition, we noted that "[t]here is a danger that lawyers in the position in which Smith placed herself 'would be motivated to cant advice artificially in the safe direction,'" *Harris–Smith*, 356 Md. at 84, 737 A.2d at 573 (quoting C.W. Wolfram, *Sneaking Around in the Legal Profession: Interjurisdictional Unauthorized Practice by Transactional Lawyers*, 36 S. TEX. L. REV. 665, 698 (1995)), and that "the operation of the triage by the unadmitted attorney, from an office for the general practice of law in Maryland," might be "used 'as a shield behind which to conduct an unlimited-in-fact law practice.'" *Id.*

In our consideration of the appropriate sanction, we gauged the graveness of Harris–Smith's conduct against MRPC 8.4

generally (*see supra* note 7) and concluded that her conduct did not reach the level of a violation of MRPC 8.4(b) and (c), "both of which would be serious violations going to the attorney's integrity." *Harris–Smith*, 356 Md. at 90, 737 A.2d at 577.[15] Reasoning that Harris–Smith's unauthorized practice of law "result[ed] from [her] attempt to practice within the limits of her admission to the bar of the federal district," we acknowledged that her "attempt was unsuccessful solely at the beginning of the process, when [Harris-]Smith analyzed the problems presented by those who sought her services and advised them how to proceed." *Id.* Therefore, taking into account the fact that Harris–Smith subsequently moved her office from Maryland to the District of Columbia, we found that a 30 day suspension was sufficient "to deter other unadmitted attorneys from undertaking a federal practice from an office in Maryland from which the non-admitted attorney would hold himself or herself out to the public as generally practicing law in order to identify cases that the attorney was authorized to handle." *Harris–Smith*, 356 Md. at 91, 737 A.2d at 577.

In imposing the 30–day suspension, we noted that Harris Smith's admission to the Maryland federal court distinguished her case from two other cases, *Harper and Kemp* and *James,* where the violations of MRPC 5.5(a) resulted in disbarment because those cases "presented purely a territorial issue with no federal overlay." *Harris–Smith*, 356 Md. at 91, 737 A.2d at 577. We also found implicitly the facts of *Harris–Smith* to be more similar to situations where a violation of MRPC 5.5(b) had occurred, involving attorneys admitted to the Maryland Bar who assist unadmitted lawyers or lay persons in the practice of law in Maryland. Thus, we explained that Harris–Smith's case, for purposes of the sanction, was analogous to *Attorney Grievance Comm'n v. Hallmon*, 343 Md. 390, 681 A.2d 510 (1996), where an attorney was suspended for 90 days for failing to maintain a trust account, failing to respond to

---

15. In contrast, Barneys violated MRPC 8.4(b), (c), and (d).

Bar Counsel, and assisting a lay person in the unauthorized practice of law.[16] *Harris Smith*, 356 Md. at 92, 737 A.2d at 578.

## 2. The Twilight Zone

The significance of the "federal overlay" relied on in *Harris–Smith* is evident in *Kennedy v. The Bar Ass'n of Montgomery County*, 316 Md. 646, 561 A.2d 200 (1989). In *Kennedy*, the Bar Association of Montgomery County brought suit and obtained a permanent injunction "directed at preventing continuation of the illegal conduct [(unauthorized practice of law)] in which the court found Kennedy to be engaged." *Kennedy*, 316 Md. at 668, 561 A.2d at 211.[17] Kennedy, who was admitted to the District of Columbia Bar and the Maryland federal court, had a law office in Silver Spring, Maryland. His partner, Edward Jasen, was a member of the Maryland and District of Columbia Bars. As we explained, "Kennedy produced ninety percent of the business for the firm, and did eighty to ninety percent of the work done by the firm in the office. . . . Jasen and Kennedy almost always presented themselves together before the court. But Jasen rarely moved for

---

16. In recent years, the conduct of four attorneys in Maryland has been found to violate MRPC 5.5(b). *See Attorney Grievance Comm'n v. Harper and Kemp*, 356 Md. 53, 737 A.2d 557 (1999); *Attorney Grievance Comm'n v. Brown*, 353 Md. 271, 725 A.2d 1069 (1999); *Attorney Grievance Comm'n v. Brennan*, 350 Md. 489, 714 A.2d 157 (1998); *Attorney Grievance Comm'n v. Hallmon*, 343 Md. 390, 681 A.2d 510 (1996). Each of these cases resulted in suspensions, ranging from 90 days to indefinite suspension. *Harper and Kemp* provides a good example of how we have ordinarily distinguished between MRPC 5.5(a) and MRPC 5.5(b) violations in imposing sanctions. In that case, Harper, an attorney not admitted to the Maryland Bar, was disbarred for violating MRPC 5.5(a). *Harper and Kemp*, 356 Md. at 70, 737 A.2d at 566. His partner, Kemp, however, who was admitted to the Maryland Bar, was suspended for three years for assisting Harper in the unauthorized practice of law in violation of MRPC 5.5(b). *Harper and Kemp*, 356 Md. at 71, 737 A.2d at 566.

17. Following this case, Kennedy consented to disbarment in Maryland. Thus, his unauthorized practice of law led to eventual disbarment, rather than suspension.

Kennedy's *pro hac vice* admission...." *Kennedy,* 316 Md. at 653, 561 A.2d at 204.

In modifying the broad injunction of the Circuit Court, we addressed Kennedy's "claimed right to practice federal and non-Maryland law [in Maryland]." *Kennedy,* 316 Md. at 661, 561 A.2d at 207. While we acknowledged that the "federal overlay" permitted by Kennedy's admission to the federal court in Maryland enabled Kennedy to practice law before the local federal court, *Kennedy,* 316 Md. at 661, 561 A.2d at 208, we rejected Kennedy's contention that he was free to practice federal and non-Maryland law from his Silver Spring office. Stating that "Kennedy's theory ... would ... permit the unadmitted attorney to advise the client concerning only a portion of the general legal spectrum but then prohibit the unadmitted attorney from advising as to the balance of the spectrum," *Kennedy,* 316 Md. at 662–63, 561 A.2d at 208, we further pointed out, similar to *Harris–Smith,* that "[Kennedy] is not permitted to sort through clients who may present themselves at his Maryland office ... because the very acts of interview, analysis and explanation of legal rights constitute practicing law in Maryland." *Kennedy,* 316 Md. at 666, 561 A.2d at 210. Even though we considered it "practically impossible" for Kennedy to maintain a principal office in Maryland exclusively for engaging in a practice before the courts to which he was admitted, *Kennedy,* 316 Md. at 667, 561 A.2d at 211, we suggested possible exceptions, indicating in a footnote that "[f]or example, Kennedy might limit his practice from the Silver Spring office to Maryland federal and D.C. cases referred by other attorneys." *Kennedy,* 316 Md. at 668 n. 9, 561 A.2d at 211 n. 9.

### 3. The Rule

As in *Kennedy; Attorney Grievance Comm'n v. Harper and Kemp* involved an unadmitted attorney aligning himself with a Maryland attorney in order to cloak his unauthorized practice of law. Harper, who was admitted to the District of Columbia Bar, and Kemp, who was admitted in Maryland, established the law firm of "Harper and Kemp" in Baltimore in 1995 to

assume the pending cases of two disbarred attorneys.[18] Harper also maintained an office in the District of Columbia. As a partner of Harper and Kemp, Harper signed retainer agreements between the firm and personal injury clients and drew fifty-five settlement checks, totaling $110,353.93, from the firm's escrow account. Harper also drew checks from the same account totaling $ 82,241.97, payable to cash,[19] to Harper personally, or to Harper and Kemp. *Harper and Kemp*, 356 Md. at 59, 737 A.2d at 560.

We addressed three complaints from the firm's clients that resulted in the petition for disciplinary action against both Harper and Kemp. Finding that Harper violated MRPC 5.5(a), we also concluded that Harper violated MRPC 7.1 and 7.5 (*see supra* note 4) in one of these complaints (the Foster/Anderson complaint). *Harper and Kemp*, 356 Md. at 67, 737 A.2d at 564. Regarding the MRPC 7.1 violation, we agreed with Bar Counsel that Harper had written a letter to the client, Anderson, that was "materially misleading by implying that Harper had Anderson's file and could settle her claim." *Harper and Kemp*, 356 Md. at 68, 737 A.2d at 565. With regard to MRPC 7.5, we also agreed with Bar Counsel that two letters written by Harper to Anderson did not identify Kemp and identified Harper as licensed in the District of Columbia, "thereby ... creating the false impression that, in addition to being licensed in D.C., Harper [was] licensed in Maryland." *Id.*

In considering the appropriate sanction for Harper, we found his violation of MRPC 5.5(a) to be both "deliberate and

---

18. Harper and Kemp also were admitted to practice before the United States District Court for the District of Maryland, but that fact was not relevant to the issues presented in the case. *See Harper and Kemp*, 356 Md. at 56 n. 2, 737 A.2d at 559 n. 2. This explains why *Harper and Kemp* was distinguished in *Harris–Smith* in terms of the influence of a "federal overlay."

19. We found this to be a violation of Rule 16–609. *See Harper and Kemp*, 356 Md. at 64, 737 A.2d at 563. The purpose of Rule 16–609 is "to enable one who is authorized to do so to trace the disposition of escrow funds." *Harper and Kemp*, 356 Md. at 65, 737 A.2d at 563.

persistent." *Harper and Kemp,* 356 Md. at 70, 737 A.2d at 566. As we explained,

> [h]e set up an office for the general practice of law in Baltimore City in order to wring whatever value he could out of the inventory of pending cases of a disbarred lawyer who had practiced in Baltimore City. There is no reasonable basis on which Harper could have thought that his conduct was lawful. His motive in creating Harper & Kemp was greed. There is no mitigation. Other unadmitted attorneys must be deterred from attempting to practice law in violation of the statutory prohibition against unauthorized practice.

*Id.* Therefore, we found that the appropriate sanction was disbarment.

*Johnson* is the most recent case of an attorney whose unauthorized practice resulted in disbarment. Johnson, admitted in Virginia and the District of Columbia, opened a law practice in Silver Spring, Maryland, with an attorney admitted in Maryland. Although Johnson testified that he only handled Virginia and D.C. cases, leaving Maryland cases to his partner, we concluded that Johnson had violated MRPC 5.5(a) based on the hearing judge's finding that he " 'met with clients in a Maryland office and advised clients in that office.' " *Johnson,* 363 Md. at 625, 628, 770 A.2d at 146, 148. We also noted the hearing judge's finding that he "misled the public, as well as his clients, by not including his jurisdictional limitations on the firm's letterhead . . . ." *Johnson,* 363 Md. at 625, 770 A.2d at 146.

A substantial portion of our opinion in *Johnson* was dedicated to addressing Johnson's legal representation of a Maryland couple whose home he contracted to purchase. While the couple was living abroad, Johnson filed a bankruptcy petition on their behalf without their knowledge or consent, forging their signatures on the papers, as well as his partner's signature. We found that this conduct constituted violations of MRPC 8.4(a), (c) and (d), *Johnson,* 363 Md. at 631, 770 A.2d at

150, a litmus test that we used in *Harris–Smith* to assess what sanction was appropriate.

We further justified disbarment by stating that Johnson "repeatedly engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation." *Johnson*, 363 Md. at 633, 770 A.2d at 151. Regarding MRPC 5.5(a) and the goal of deterrence in particular, we likened Johnson's case to *Harper and Kemp*, citing its earlier statement that " 'other unadmitted attorneys must be deterred from attempting to practice law in violation of the statutory prohibition against unauthorized practice.' " *Id.*

Of the MRPC 5.5(a) unauthorized practice cases, *James* certainly presents a most tenacious violator. James was admitted to the Maryland Bar in 1971. At the time of his disbarment, he had been suspended three times previously. The first suspension, imposed in 1984, involved commingling of funds, for which he was suspended for two years. The second suspension, which involved the use of deception to circumvent a statutorily mandated procedure, was issued nine years later and was for a period of one year. We found, however, that James violated the terms of the one-year suspension by engaging in the practice of law during that period of suspension. Consequently, we reimposed the one-year suspension. *Attorney Grievance Comm'n v. James*, 340 Md. 318, 666 A.2d 1246 (1995) (*James III*). That suspension expired 12 November 1996, but James failed to file a required affidavit that he " 'ha[d] complied in all respects with the term of the suspension.' " *Attorney Grievance Comm'n v. James*, 355 Md. 465, 471, 735 A.2d 1027, 1030 (1999) (*James IV*). We concluded that James was suspended continuously since 12 January 1994. *Id.*

In James III, we found that James held himself out as an attorney, and represented two clients (Romano/Orimogunje) during the period of his 1994–1995 suspension. *James IV*, 355 Md. at 477–78 n. 2, 735 A.2d at 1034 n. 2. Because *James III*

was not a disciplinary hearing,[20] in *James IV* we upheld James's exception to the findings for purposes of whether a new sanction should be imposed. *James IV*, 355 Md. at 478–79, 735 A.2d at 1035. It found by clear and convincing evidence, however, that James had represented two additional clients (Wrubelski/Jackson) during the 1994–1995 period. *James IV*, 355 Md. at 485, 735 A.2d at 1038. In addition, we noted the testimony of another client, Bernice Roane, whom James assisted in three legal matters in 1997 and 1998. *James IV*, 355 Md. at 472–73, 735 A.2d at 1031.

James argued, regarding Wrubelski and Jackson, that he neither requested nor received payment for the legal services he provided them. We rejected this proffered distinction, holding that " '[a]lthough an agreement upon the amount of a retainer and its payment is rather conclusive evidence of the establishment of the attorney-client relationship, the absence of such an agreement or payment does not indicate conclusively that no such relationship exists.' " *James IV*, 355 Md. at 476, 735 A.2d at 1033 (quoting *Central Cab Co. v. Clarke*, 259 Md. 542, 549–50, 270 A.2d 662, 666 (1970)).

In mitigation, James "produced evidence that he was an alcoholic and that his alcoholism had substantially impaired his judgment, resulting in his failure to comply with his suspension. James further produced evidence that, since July 1996, he had been sober." *James IV*, 355 Md. at 471–72, 735 A.2d at 1031. Referring to James' representation of Roane, we rebuffed James' claim, finding that "James' asserted mitigation disintegrated . . . with evidence that he was violating his suspension in 1997," after he had become sober. *James IV*, 355 Md. at 486–87, 735 A.2d at 1039. Furthermore, we concluded that "[t]he result is a record that starkly reveals James' deliberate violation of the order of suspension that has

---

**20.** The purpose of *James III* was "to determine whether James had complied in all respects with the terms of his suspension in *James II*." *Attorney Grievance Comm'n v. James,* 355 Md. 465, 479, 735 A.2d 1027, 1035 (1999).

continued since January 12, 1994." *James IV,* 355 Md. at 487, 735 A.2d at 1039.

Briscoe was decertified three times as a practicing attorney in Maryland, each time for his failure to pay Client's Security Trust Fund dues. The last decertification was imposed in April of 1998, but in September 1998, while still decertified, he represented a client in a Maryland courtroom. This instance sufficed for us to find Briscoe in violation of MRPC 5.5(a). *Briscoe,* 357 Md. at 566, 745 A.2d at 1043. In disbarring Briscoe, we explained that he

> has consistently failed to cooperate with Bar Counsel, has practiced law when unauthorized to do so, and has entered into a contingency fee arrangement, but not reduced the same to writing. He has cashed checks from settlements for clients at a time when he did not maintain a trust account and failed to make the appropriate disbursements from those settlements, was unable or unwilling to produce records relating to some of the disbursements, and he failed to refund fees when required to do so.

*Briscoe,* 357 Md. at 568, 745 A.2d at 1044.

Although the "latter violations involving the mishandling of clients' funds alone warrant[ed] disbarment," *Id.* (citing *Attorney Grievance Comm'n v. Milliken,* 348 Md. 486, 519, 704 A.2d 1225, 1241 (1998) (citation omitted)), we also found that "commingling and conversion of client funds, in the absence of mitigating circumstances, ordinarily warrants disbarment." *Id.* (citations omitted). Therefore, where "[Briscoe] ha[d] presented nothing in mitigation," we disbarred him from the practice of law. *Briscoe,* 357 Md. at 568, 745 A.2d at 1044.

## B.

## Where Does Barneys' Case Fall on the Unauthorized Practice Continuum?

In four of the six unauthorized practice cases discussed *supra,* we expressly identified "deterrence" as one objective of the imposed sanctions (*Harris–Smith, Harper and Kemp,*

*Johnson, Briscoe* ). In Respondent's case, we would fail to achieve this goal, and be inconsistent with the clear majority of our prior cases, were we to adopt Respondent's proposed sanction or merely suspend him. Of the prior cases where attorneys were found to have violated MRPC 5.5(a), only in *Harris–Smith* was the attorney spared disbarment. Her case, however, is significantly different from the others. The major difference is that she was the only attorney who never actually represented a client in a Maryland state court proceeding. Respondent, however, represented at least five clients in Maryland state courts-equal to the number in *Johnson,* and more than in *Briscoe.* Were we to adopt Respondent's recommendation for sanction or suspend him, he would be the first non-admitted attorney to evade disbarment after having represented clients in Maryland state courts in violation of MRPC 5.5(a).

The second distinguishing factor of Respondent's case from *Harris–Smith* is the absence here of a "federal overlay." The "federal overlay" factor is significant because it provides at least some plausible reason why an attorney might believe that he or she is within his or her rights in maintaining a practice or office in Maryland. In fact, we gave one example in *Kennedy* of how an attorney legitimately might maintain an office in Maryland for the purpose of practicing federal law without running afoul of MRPC 5.5(a). *See supra* at 19. In "Respondent's Recommendation for Sanction," Respondent claimed to be unaware that he was not permitted to maintain a secondary office in Maryland (his main office being in the District of Columbia). He is unable, however, to resort to the "federal overlay exception" to justify this assertion because he is not admitted to the Maryland federal court. Furthermore, *Harper and Kemp* demonstrates that the mere existence of another office in a jurisdiction where an attorney is admitted does not insulate the attorney from sanctions for the unauthorized practice of law in Maryland.

The third distinguishing factor between Respondent's case and *Harris–Smith* is that, unlike Respondent, Harris–Smith endeavored to practice law within her arguable jurisdictional

limits, a point relied on by the *Harris–Smith* Court. *See supra* at 16. Besides refraining from representing clients in Maryland state courts, Harris–Smith ceased to hold herself out as a Maryland attorney when she corresponded with the firm's clients, using letterhead that properly indicated her jurisdictional limitations. Respondent, on the other hand, held himself out as an authorized Maryland attorney by means of his business cards, his letterhead, and signs in the building and immediately outside his office suite.

Respondent claims that he "has cooperated fully with the Attorney Grievance Commission" by voluntarily closing his Maryland office and operating from his office in the District of Columbia since approximately May 1999. The "voluntary" nature of Respondent's act is tempered, however, as he closed his office only after his involvement in the Sanchez case was discovered and he was threatened with an injunction action. Had his misconduct not been discovered then, there is nothing in the record to suggest Barneys would not have continued or even expanded his illegal activities. In our view, it seems that Respondent, at best, cooperated with the investigation (to the extent he did) only when he had little real choice to do otherwise.[21] In addition, even if Respondent's ultimate termination of misconduct was viewed as voluntary, this alone would not warrant necessarily a sanction less than disbarment. Although Harris–Smith, who was suspended, terminated her practice of law in Maryland when the investigation by Bar Counsel commenced, Harper, who also ceased his misconduct upon its discovery, was not spared disbarment.

Although remorse and regret are recognized as mitigating factors (*see Johnson,* 363 Md. at 632, 770 A.2d at 150 (discussing *Attorney Grievance Comm'n v. O'Neill,* 285 Md. 52, 53, 400 A.2d 415, 416 (1979)); *Attorney Griev. Comm'n v. Wyatt,*

---

21. Barneys' false statement to the Petitioner's investigator regarding the extent of his unauthorized practice of law is significant not only because it belies Barneys' "cooperation" with the investigation, but also because it displays bad judgment and untruthfulness regarding misconduct that carried a likelihood of inevitable discovery at the time the denial was made.

323 Md. 36, 38, 591 A.2d 467, 468 (1991)), we find it impossible to parse with sufficient certainty whether Respondent's claimed remorse is sincere, mere lip service, or simply damage control.

Overall, our review of the unauthorized practice cases resulting in disbarment leads us to believe that they have more elements in common with Respondent's case than does his case with *Harris–Smith*. For example, although Harper seemed to have represented many more clients than Respondent, the cases share at least two common features. First, both attorneys held themselves out as admitted in Maryland, in violation of MRPC 7.5. In fact, one of Harper's regular letterheads indicated his jurisdictional practice limitations, while none of Respondent's letterheads did. Second, the description of the misconduct as "deliberate and persistent," relied on by this Court in *Harper and Kemp* and cited again in *Johnson,* appears to be an apt description of Respondent's conduct, wrongfully representing five clients in Maryland state court proceedings and pretending to represent Sanchez in a workers' compensation matter when he did not.

Respondent's conduct regarding Mr. Sanchez also highlights his deceptive tendencies,[22] making his case like *Johnson,* where we found the attorney "repeatedly engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation." Both Johnson and Respondent forged signatures of purported clients, and both caused significant damage to third parties; in Respondent's case, the losses incurred by Gates Bail Bonds and Ms. Gates.

In addition, whether the facts of a particular case sustain related or companion violations of MRPC 8.4 seems also to be an influencing factor in our choice of sanction in at least some of the unauthorized practice cases under MRPC 5.5(a). Specifically, in *Harris–Smith* we found that attorney's conduct did not reach the level of a MRPC 8.4 violation, which "would be

---

**22.** Not forgotten in this regard, Respondent misrepresented on his Petition for Admission to the Maryland Bar that he only was practicing in the District of Columbia at the time. *See supra* note 11.

[a] serious violation going to the attorney's integrity." By comparison, Harper was found in violation of MRPC 8.4(b) and (d), and Johnson in violation of MRPC 8.4(a), (c), and (d). Both were attorneys who, like Respondent, had not been admitted in Maryland previously, and who, like Respondent, undertook actual representation of clients in Maryland state court matters. Because Respondent violated MRPC 8.4(b), (c), and (d), violations that are arguably more serious than in either *Harper and Kemp* or *Johnson,* we should not shy away from disbarment

Finally, suspending Barneys rather than disbarring him would give the impression that we view his conduct as more similar to the conduct of attorneys who violate MRPC 5.5(b), rather than 5.5(a). Respondent, however, did not assist another attorney in the unauthorized practice of law; he committed the violations directly and without valid excuse or justification.

## Conclusion

Based on the Court's trend of disbarring attorneys for unauthorized practice violations under MRPC 5.5(a) violations, Respondent's multiple representation of clients in Maryland state courts, his deceptive conduct regarding the Sanchez/Gates Bail Bonds incident, the misrepresentations to Bar Counsel's investigator and on his Petition for admission, and the relative insubstantiality of any possibly mitigating circumstances, disbarment is the appropriate sanction.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT; INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(c), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST BRADFORD JAY BARNEYS; RESPONDENT'S DISBARMENT SHALL COMMENCE THIRTY DAYS FROM THE FILING OF THIS OPINION.**

Dissenting Opinion by BELL, C.J. in which ELDRIDGE, J., joins.

BELL, Chief Judge, dissenting in which ELDRIDGE J., joins.

I have no quarrel with the majority's statement of the purpose of the sanction imposed on an attorney following disciplinary proceedings or the role that the facts and circumstances of the particular case plays in the determination of that sanction. We have long recognized, see *Bar Ass'n of Baltimore City v. Marshall,* 269 Md. 510, 519, 307 A.2d 677, 682 (1973) ("It must be borne in mind that the purpose of disciplinary actions such as this is not to punish the offending attorney, as that function is performed in other types of legal proceedings, but it is to protect the public from one who has demonstrated his unworthiness to continue the practice of law"), and emphatically stated, most recently in *Attorney Griev. Comm'n v. Santos,* 370 Md. 77, 88–89, 803 A.2d 505, 511–12 (2002), that it is to protect the public rather than to punish the attorney who engages in misconduct and that the decision as to sanction in a particular case does, and must, depend on the facts and circumstances of that case. *Attorney Griev. Comm'n v. Garfield,* 369 Md. 85, 98, 797 A.2d 757, 764 (2002). *See Attorney Griev. Comm'n of Maryland v. Hayes,* 367 Md. 504, 519, 789 A.2d 119, 129 (2002); *Attorney Griev. Comm'n of Maryland v. Jeter,* 365 Md. 279, 290, 778 A.2d 390, 396 (2001); *Attorney Griev. Comm'n of Maryland v. Tolar,* 357 Md. 569, 585, 745 A.2d 1045, 1053 (2000); *Attorney Griev. Comm'n v. Franz,* 355 Md. 752, 761, 736 A.2d 339, 344 (1999); *Attorney Griev. Comm'n v. Ober,* 350 Md. 616, 631–32, 714 A.2d 856, 864 (1998); *Attorney Griev. Comm'n v. Hamby,* 322 Md. 606, 611, 589 A.2d 53, 56 (1991); *Attorney Griev. Comm'n v. Babbitt,* 300 Md. 637, 642, 479 A.2d 1372, 1375 (1984). My disagreement, which involves the application of these principles, is, however, quite basic and sharp.

Relevant to and, indeed, a part of the facts and circumstances that inform the sanction decision is "the nature and gravity of the violations and the intent with which they were committed." *Attorney Griev. Comm'n. v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997). *See Attorney Griev. Comm'n of Maryland v. Pennington,* 355 Md. 61, 78, 733 A.2d

1029, 1037–38 (1999); *Attorney Griev. Comm'n of Maryland v. Milliken,* 348 Md. 486, 519, 704 A.2d 1225, 1241 (1998); *Attorney Griev. Comm'n v. Montgomery,* 318 Md. 154, 165, 567 A.2d 112, 117 (1989). Likewise relevant are whether the objective of the sanction has been achieved, *Attorney Griev. Comm'n v. Harris–Smith,* 356 Md. 72, 90–91, 737 A.2d 567, 577 (1999), the attorney's prior grievance history, whether there were prior disciplinary proceedings, the nature of the misconduct involved in those proceedings and the nature of any sanctions imposed, as well as any facts in mitigation, *Franz,* 355 Md. at 762–63, 736 A.2d at 344; *Maryland State Bar Ass'n v. Phoebus,* 276 Md. 353, 362, 347 A.2d 556, 561 (1975), the attorney's remorse for the misconduct, *Attorney Griev. Comm'n v. Wyatt,* 323 Md. 36, 38, 591 A.2d 467, 468 (1991), and the likelihood of the conduct being repeated. *Attorney Griev. Comm'n v. Freedman,* 285 Md. 298, 300, 402 A.2d 75, 76 (1979). As to the latter, while we have held that conduct that is an aberration nevertheless can be so egregious as to warrant the imposition of a significant sanction, *see Attorney Griev. Comm'n v. Protokowicz,* 329 Md. at 252, 263, 619 A.2d at 100, 105 (1993), we have also held that an attorney's voluntary termination of the charged misconduct, when accompanied by an appreciation of the serious impropriety of that past conduct and remorse for it, may be evidence that the attorney will not again engage in such misconduct. *Freedman,* 285 Md. at 300, 402 A.2d at 76. *See Franz,* 355 Md. at 762–63, 736 A.2d at 344. See also *Harris–Smith,* 356 Md. at 90–91, 737 A.2d at 577 (acknowledging the principal objective of sanction in that case, deterrence of other non-admitted attorneys from undertaking a federal practice from an office in Maryland, was achieved when firm dissolved after bar counsel's investigation commenced).

To be sure, the misconduct in this case, as the petitioner and the majority maintain, is quite serious. As they appropriately remind us, it is the kind of misconduct, unauthorized practice of law, that this Court, has indicated must be deterred. *See Attorney Griev. Comm'n v. Harper and Kemp,* 356 Md. 53, 61–64, 737 A.2d 557, 561–63 (1999). Just as troublesome, if not more so, are representations that the

respondent was found to have made that misled or were false, and knowingly so.

On the other hand, while serious, the respondent's misconduct does not rise to the level of egregiousness of the misconduct in *Harper and Kemp* and *Attorney Griev. Comm'n v. Johnson,* 363 Md. 598, 770 A.2d 130 (2001), on which the petitioner relies and in both of which the ultimate sanction of disbarment was imposed. In *Harper and Kemp,* we characterized the misconduct as "deliberate and persistent" where the attorney "set up [an] office for the general practice of law in Baltimore City in order to wring whatever value he could out of the inventory of pending cases of a disbarred lawyer who had practiced in Baltimore City." 356 Md. at 70, 737 A.2d at 566. As the petitioner points out, we also concluded that there was "no reasonable basis on which [the attorney] could have thought his conduct was lawful," *id.,* observing further "[h]is motive in creating Harper & Kemp was greed. There is no mitigation." Id.

In *Johnson,* to be sure, the unauthorized practice of law in Maryland was at the core of the case; however, there were a great many more violations implicating the fitness of the respondent in that case to practice law anywhere, including violations of Rules 8.4(a), (c) and (d),[1] 363 Md. at 631, 770 A.2d at 150. There, the respondent and another lawyer "forged a professional association when they began sharing office space, equipment, support staff, and expenses in Silver Spring, Montgomery County, Maryland," practicing under the firm name, "Law Offices of McLemore and Johnson, P.C." 363 Md. at 604,

---

1. Maryland Rule of Professional Conduct 8.4, in relevant part, provides:
 "It is professional misconduct for a lawyer to:
 "(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through acts of another;
 * * * *
 "(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
 "(d) engage in conduct that is prejudicial to the administration of justice."
 * * * *

770 A.2d at 134. Although the respondent was admitted to practice only in Virginia and the District of Columbia, not Maryland, the office was located only in Maryland and he did not indicate his jurisdictional limitations on the firm's letter- head, a fact that the hearing court found, and we affirmed, misled both the public and the respondent's clients. That the respondent met and advised his clients in his Maryland office and filed a notice of bankruptcy in the Circuit Court for Prince George's County was determined to be the unauthorized prac- tice of law. In addition to the violations establishing the unauthorized practice of law, the Court had before it violations arising out of the respondent's representation of clients, in which he acquired the clients' home, giving rise to questions of dishonesty, fraud, and misrepresentation.

Aware of the factors to be considered when determining the appropriate sanction, we observed that the respondent "nei- ther recognize[d] that his conduct violated the MRPC nor expresse[d] any regret for the harm he caused." *Johnson,* 363 Md. at 632, 770 A.2d at 151. In fact, the hearing judge found that his actions were "without excuse or mitigation." Id. Then, after acknowledging that the respondent had en- gaged in "repetitive instances of unauthorized practice of law," we specifically noted his repeated engagement in conduct involving dishonesty, fraud, deceit, and misrepresentation; "[h]e made false statements to a tribunal, and he acted against the interests of [his clients] during and after the sale of their home to him." *Id.* at 633, 770 A.2d at 151.

Taking a slightly different tack, the majority's analyzes the relatively recent cases in which the flagship violation was the unauthorized practice of law,[2] in addition to *Johnson* and *Harper and Kemp; Attorney Griev. Comm'n v. Briscoe,* 357

---

**2.** Another relatively recent case, *Attorney Griev. Comm'n v. Brown,* 353 Md. 271, 725 A.2d 1069 (1999), involved a violation of Rule 5.5(b), providing that a lawyer may not "assist a person who is not a member of the bar in the performance of activity that constitutes the unautho- rized practice of law." In that case, this Court explained why the respondent's association with an attorney not licensed to practice law

Md. 554, 745 A.2d 1037 (2000); *Attorney Griev. Comm'n v. James*, 355 Md. 465, 735 A.2d 1027 (1999); *Attorney Griev. Comm'n v. Kennedy*, 319 Md. 110, 570 A.2d 1243 (1990); *Attorney Griev. Comm'n v. Harris–Smith*, 356 Md. 72, 737 A.2d 567 (1999). 370 Md. at 579, 805 A.2d at 1047. Noting that only in one of the cases, Harris–Smith,in which a 30 day suspension was the sanction, was the sanction other than disbarment, it concludes that "the present case has more in common with the cases that resulted in disbarment than the isolated result of the suspension in *Harris–Smith*" and that the "evidence of mitigation in this record, such as it is, is insufficient to suggest that disbarment is not the proper sanction here." Id. at 579, 805 A.2d at 1047. Try as it might, it simply does not make the case.

To be sure, the conduct in this case is more egregious than that in *Harris–Smith*. Unlike in this case, there, Harris Smith, who was admitted to the bar of the United States District Court for the District of Maryland, did not represent clients in Maryland state court proceedings, and made an effort to conduct her practice in Maryland consistent with her admission to the federal court.[3] And the Rule 8.4(b) and (c)

---

in the State of Maryland and oral entry of appearance on behalf of a client in an administrative hearing constituted "practice of law":

"None of the court pleadings associated with Ms. Jones' case contain Mr. Wilder's signature; nevertheless, Mr. Wilder's name appears below respondent's signature on those pleadings. Respondent also introduced Mr. Wilder as co-counsel on behalf of Ms. Jones to the administrative hearing examiner. The clerk of this Court has certified that Mr. Wilder is not admitted to practice in Maryland and records show that he has moved to practice pro hac vice only once in an unrelated 1995 case. Mr. Wilder's oral appearance on behalf of Ms. Jones at the administrative hearing constituted a "practice of law," in which respondent assisted in violation of MRPC 5.5(b)." 353 Md. at 289, 725 A.2d at 1078. That violation plus numerous others, including failure to pursue matters diligently, failure to communicate with clients, failure to cooperate with Bar Counsel and a violation of Rule 8.4(c) (engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation") resulted in an indefinite suspension, with the right to reapply within one year. *Id.* at 296, 725 A.2d at 1081.

3. This is the "federal overlay," which the majority views as of significant importance to the determination of the appropriate sanction in this

charges against her were not sustained, as they were, albeit by consent, in the instant case. Indefinite suspension, what I consider the appropriate sanction in this case, is a much more severe sanction than that imposed in *Harris–Smith.*

It simply is not accurate to say that the facts of this case are close to the facts in the cases on which the majority relies. I have already, in refuting the petitioner's argument, demonstrated the extreme difference between the case sub judice and *Harper and Kemp* and Johnson. What the *Harris–Smith* court had to say about *James* concisely and accurately describes the situation and clearly differentiates that case from

case. It was of significance in *Harris–Smith,* of course, because it was her defense: being admitted to the federal bar in Maryland, if she practiced consistent with that admission, that is, brought cases only in federal court and did not represent clients in State court, any allegation of a deliberate and willful intent to violate the unauthorized practice Rule would be negated. On the other hand, where the attorney is not admitted to the federal bar, or is admitted, but acts inconsistently with that admission, i.e., practices in State court, rather than federal court, it is the quality and quantity of the activity in the court to whose bar the attorney has not been admitted that will control. In other words, the attorney's intent, would have to be shown by the facts and circumstances of the case.

In none of the cases on which the majority relies, except *Harris–Smith,* was there a federal overlay in the context of a disciplinary proceeding. That is not because none of the respondents was admitted to the federal bar, both Kemp and Harper were, as the majority itself notes, see 370 Md. 582 n. 16, 805 A.2d 1048, 1049 n. 16, rather, it is because none of them raised that as a defense or could have, given the nature and situs of the activity involved.

The federal overlay issue in *Kennedy* arose in the context of proceedings to limit an injunction entered against *Kennedy* and enjoining his unauthorized practice of law, proceedings that preceded disciplinary proceedings being initiated against *Kennedy v. Bar Ass'n of Montgomery County, Inc.* 316 Md. at 646–650, 561 A.2d at 200–202. As the *Harris–Smith* court pointed out,

> "*Kennedy* was not admitted to practice in Maryland and did not in fact attempt to limit his practice from his Maryland office to matters before the Maryland District. The federal overlay issue arose in *Kennedy* only after he had been enjoined from the unauthorized practice of law, and he sought to limit the scope of the state court injunction."

356 Md. at 91, 737 A.2d at 577. That the case sub judice compares unfavorably to *Harris–Smith* has been admitted; accordingly, as to it, if there were a federal overlay, it would add nothing. Nor does it add anything when this case, which has no federal overlay, is compared to other cases, which also do not have a federal overlay.

this one: "James was an admitted but suspended lawyer who continued to practice law from his Maryland office after he had been suspended." 356 Md. at 91, 737 A.2d at 577. In fact, the detailed description of that case by the majority, see 370 Md. at 586–587, 805 A.2d at 1051–1052, itself more clearly identifies and demonstrates the significant differences between the cases. That discussion reveals not only "a most tenacious violator," but one whose unauthorized practice was persistent, willful, unabashed, deceitful and done without remorse or even a hint that he knew or cared that it was wrongful.

*Briscoe* similarly can be distinguished. This Court pointed out as a most significant factor that Briscoe "has disregarded an order of this Court by continuing to practice law while decertified as a practicing attorney because of his failure to pay Client's Security Trust Fund dues (and, he has been decertified three times since 1989 for failure to pay these dues)." 357 Md. at 566, 745 A.2d at 1044. By itself, this makes *Briscoe* a stronger case for disbarment, for it demonstrates both a disregard for an order of court specific in its application to the attorney and in its prohibition against that attorney practicing law. In addition, however, other factors entered into the disbarment decision, as the majority acknowledges, 370 Md. at 587–588, 805 A.2d at 1052:

"Respondent, at least since the February 2, 1999 Inquiry Panel hearing, if not before, has consistently failed to cooperate with Bar Counsel, has practiced law when unauthorized to do so, and has entered into a contingency fee arrangement, but not reduced the same to writing. He has cashed checks from settlements for clients at a time when he did not maintain a trust account and failed to make the appropriate disbursements from those settlements, was unable or unwilling to produce records relating to some of the disbursements, and he failed to refund fees when required to do so. As this Court has noted many times before, these latter violations involving the mishandling of clients' funds alone warrant disbarment. *Id. [Atty. Griev. Com'n v. Milliken]* at 519, 704 A.2d at 1241 ("Respondent's treatment of his trust account in violation of Rules [16–607] and [16–609]

alone warrants disbarment. As we have repeatedly said, commingling and conversion of client funds, in the absence of mitigating circumstances, ordinarily warrants disbarment." (citing [*Attorney Griev. Comm'n v.*] *Myers,* 333 Md. [440,] 449, 635 A.2d [1315,] 1319 [(1994)]; *Attorney Grievance Comm'n v. White,* 328 Md. 412, 417, 614 A.2d 955, 958 (1992); *Attorney Grievance Comm'n v. Bakas,* 323 Md. 395, 403, 593 A.2d 1087, 1091 (1991); *Attorney Grievance Comm'n v. Lazerow,* 320 Md. 507, 513, 578 A.2d 779, 782 (1990); *Attorney Grievance Comm'n v. Ezrin,* 312 Md. 603, 608–09, 541 A.2d 966, 968 (1988))). Respondent has presented nothing in mitigation."

357 Md. at 568, 745 A.2d at 1044.

*Kennedy,* too, fails to assist the majority. *Kennedy* consented to disbarment. *Attorney Griev. Comm'n v. Kennedy,* 319 Md. 110, 570 A.2d 1243 (1990).

Here, the respondent has not heretofore been sanctioned for misconduct and, in fact, has not before been the subject of disciplinary proceedings. He also readily admitted his involvement in the unauthorized practice of law and has never sought to deny or minimize it. Similarly, he has not disputed any of the other violations except the one charging him with making an untruthful statement to the petitioner's investigator. As the majority has pointed out, dismissal of that violation would not have changed the nature or the seriousness of the violations. Moreover, the respondent terminated the misconduct voluntarily, albeit after his involvement in the *Sanchez* case was discovered. *See Franz,* 355 Md. at 762–63, 736 A.2d at 344 (where the respondents self reported, but only after becoming aware that the media intended to do a story about lawyers soliciting clients after a train derailment and that they were among the lawyers who would be mentioned). And the respondent has expressed remorse and regret for having engaged in the misconduct.

To reach the sanction it wishes to impose, the majority pays "mere lip service" to the test that this Court has adopted and it has itself acknowledged, that the appropriate sanction for

particular misconduct depends on the facts and circumstances of the case; instead, focusing only on the nature of the violation, the fact of the violation and deterrence as one of the goals of a sanction, it attempts to equate the case sub judice with those cases in which this Court previously has imposed disbarment as a sanction. That four of the six cases on which it relies, mentioned deterrence as the objective of the sanction imposed or the fact that suspending the respondent would make him "the first non-admitted attorney to evade disbarment after having represented clients in Maryland state courts in violation of MRPC 5.5(a)," 370 Md. at 589, 805 A.2d at 1053, is an insufficient basis on which to disbar the respondent. This is especially the case when the unauthorized practice engaged in by the respondent does not come anywhere close to that engaged in by Harper and Kemp. Handling five cases over the course of two years does not come close to the conduct condemned in *Harper and Kemp,* opening a law office in Baltimore City for the express purpose of allowing a non Maryland lawyer to engage in the unauthorized practice of law, "to wring whatever value he could out of the inventory of pending cases of a disbarred lawyer who had practiced in Baltimore City." 356 Md. at 70, 737 A.2d at 566.

Nor can the respondent's conduct regarding Mr. Sanchez be equated with that in *Johnson* or be characterized as "repeatedly engag[ing] in conduct involving dishonesty, fraud, deceit, and misrepresentation." 370 Md. at 591, 805 A.2d at 1054. The respondent's conduct with respect to the Sanchez matter was reprehensible and caused damage to a third party, but it was a single instance. Johnson's conduct, according to this Court, in addition to being appropriately characterized as "repeatedly engag[ing] in conduct involving dishonesty, fraud, deceit, and misrepresentation," consisted of making false statements to a tribunal and acting against the interests of his clients during and after the sale of their home to him. *Johnson,* 363 Md. at 633, 770 A.2d at 151. In addition, while Johnson forged the signatures of his purported clients, they disputed having retained him, and the signature of his "part-

ner," there is no comparable finding that the respondent did the same in this case. *Id.* at 608, 770 A.2d at 136.

The majority questions the voluntariness of the respondent's cooperation and the sincerity of his remorse, concluding, as to the latter, "we find it impossible to parse with sufficient certainty whether Respondent's claimed remorse is sincere, mere lip service, or simply damage control." 370 Md. at 591, 805 A.2d at 1054. It relies also on the fact that the respondent was found to have violated Rules 8.4(b), (c) and (d), which is consistent with the Harper violation of Rule 8.4(b) and (d), and Johnson's violation of Rule 8.4(a), (c), and (d). <u>Id.</u>

As we have seen, this Court has stated that the voluntariness of the respondent's cooperation, even though it occurs after an investigation has begun, is mitigating, as is the respondent's remorse. *Freedman,* 285 Md. at 300, 402 A.2d at 76 (" 'The Respondent voluntarily terminated his relationship with Williams over seven years ago. He voluntarily made this information known to the Federal investigators and has not used runners since discharging Williams.' "). See *Franz,* 355 Md. at 763–64, 736 A.2d at 344, in which we observed:

"The respondents, within a short time of its occurrence, recognized the impropriety of their having made direct contact with the victims of the train accident and immediately withdrew as counsel for those clients. They subsequently cooperated with those former clients and new counsel of their choice, turning over the results of their investigation in the process. The respondents neither charged, nor accepted, a fee for the time spent investigating the accident or facilitating, with new counsel, a smooth transition. Nor did they seek, or accept, reimbursement for the expenses incurred. Moreover, the respondents self reported their misconduct to the petitioner, prior to the publication of a newspaper article that detailed their and other attorney's conduct in connection with the train accident. In addition, the respondents cooperated fully with the petitioner in its investigation leading to these charges being filed. As we have seen, the respondents have never denied their misconduct or sought to minimize it; rather, they have taken full

responsibility and stated repeatedly their regret for having engaged in it."

We have even recognized that whether the objective of the sanction has been achieved is a legitimate consideration and that the objective may be achieved by voluntary action prompted by the investigation. *Harris–Smith,* 356 Md. at 90–91, 737 A.2d at 577.

What the majority says about cooperation and remorse can be said about those matters in any case. Rather than a legitimate application of the factors, it seems more an unwillingness to apply factors that the Court already has determined to be appropriate in assessing the sanction in an attorney disciplinary case. In any event, there is an objectivity about both the cooperation and remorse issues that the majority discounts. At all times, the respondent has admitted the serious impropriety, accepted full responsibility, except for disputing the allegation that he made a misrepresentation to the petitioner's investigator concerning the number of cases he had filed in Maryland courts, and cooperated with the petitioner's investigation. Quite significantly, the respondent did not dispute the Rule 8.4 violations, quite serious charges, a clear indication both of the acceptance of responsibility and the expression of remorse.

Considering all of the facts and circumstances, not simply some of them, and viewing them objectively, without predetermining what the appropriate sanction should be, I believe that the appropriate sanction is an indefinite suspension from the practice of law.

I dissent.

Judge ELDRIDGE joins in the views expressed herein.