714 A.2d 157

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Eugene M. BRENNAN, Jr.**

**Misc. AG No. 39, Sept. Term, 1997.**

Court of Appeals of Maryland.

July 29, 1998.

Melvin Hirshman, Bar Counsel, and Glenn M. Grossman, Deputy Bar Counsel, for Attorney Grievance Com'n of Maryland.

T. Joseph Touhey, Glen Burnie, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

In a petition filed in July, 1997, the Attorney Grievance Commission (AGC) charged Eugene M. Brennan, Jr. with several violations of the Maryland Lawyers' Rules of Professional Conduct (MLRPC). The petition was triggered by a complaint made by Linda Gunn and arose from Brennan's representation of Ms. Gunn's son in a juvenile court proceeding and from his association and dealings with a suspended lawyer, Richard Allen James. In accordance with former Maryland Rule BV 9 b (current Rule 16–709b.), we referred the petition to Judge Lawrence H. Rushworth, of the Circuit Court for Anne Arundel County, to conduct a hearing and make findings of fact and proposed conclusions of law.

After conducting an evidentiary hearing, Judge Rushworth issued an opinion in which he found that Brennan had violated MLRPC Rules 1.3 (duty to act with reasonable diligence), 1.4 (communication with client), 8.3 (reporting MLRPC violations by another lawyer), and 8.4(a) and (c) (violating or assisting in the violation of MLRPC and conduct involving misrepresenta-

tion). Judge Rushworth determined that there was insufficient evidence, however, to establish a violation of MLRPC Rules 5.4 (sharing fees with a non-lawyer), 5.5 (assisting a non-lawyer in activity constituting the practice of law), 8.1 (making a false statement or misrepresentation to an Inquiry Panel), or 8.4(d) (conduct prejudicial to the administration of justice). AGC filed exceptions to Judge Rushworth's rulings on the alleged Rule 5.4, 5.5, and 8.1 violations and has recommended that Brennan be suspended for 18 months. Brennan has accepted the findings made with respect to Rules 1.3, 1.4, and 8.4, but believes that nothing greater than a reprimand is in order.

We shall sustain AGC's exceptions and suspend Brennan from the practice of law for 90 days.

## BACKGROUND

Brennan's difficulty stems principally from his dealings with Richard Allen James. In July, 1984, we suspended James from the practice of law for two years, based on a similar suspension ordered in the District of Columbia. *Attorney Griev. Comm'n v. James*, 300 Md. 297, 477 A.2d 1185 (1984). The suspension arose essentially from James's misuse and commingling of client funds and misrepresenting to his client and to the court what he had done. In December, 1993, we again suspended James, for one year, for having improperly endorsed a check payable to the Division of Parole and Probation and deposited it in his escrow account. *Attorney Griev. Comm'n v. James*, 333 Md. 174, 634 A.2d 48 (1993). That suspension was to commence January 12, 1994.

Brennan first came to AGC's attention in connection with James's attempt to be reinstated. Former Md. Rule BV 13 a.2. (current Rule 16–713 a.2.) allowed a suspended attorney to recommence practice at the conclusion of the suspension period only after filing with Bar Counsel a verified statement that the attorney had complied in all respects with the terms of the suspension and upon notification by Bar Counsel to this Court that the statement had been filed and was acceptable. James

filed such a statement with Bar Counsel in January, 1995. In the course of investigating that statement, Bar Counsel determined that James had, in fact, been practicing law during the period of suspension and that Brennan had been assisting him in that practice, and he so informed this Court. We referred the matter to Judge McKee, of the Circuit Court for Prince George's County, to conduct a hearing and make appropriate findings. *Attorney Griev. Comm'n v. James,* 340 Md. 318, 666 A.2d 1246 (1995).

James claimed that Brennan had taken over his law practice and that James had been acting only as a law clerk or paralegal for Brennan. Judge McKee found otherwise, concluding from the evidence that "[t]o the public, it could reasonably have appeared that [James] continued to practice law," that he "continued to draft legal documents, negotiate on behalf of clients, and even sign legal documents," and that "[t]his combination of public appearance and internal operating procedure created an atmosphere where [James] continued to effectively hold himself out as a practicing attorney." *Id.* at 332, 666 A.2d at 1252.

Judge McKee's finding necessarily implied that Brennan was not acting solely in the role of supervising attorney, with James being merely a law clerk or paralegal, but that Brennan, in effect, assisted James in engaging in a prohibited practice of law. That implicit determination, along with information coming to Bar Counsel's attention regarding other matters in which both Brennan and James were involved, led Bar Counsel, in July, 1995, to file charges against Brennan for violating MLRPC Rules 5.3, 5.5(b), and 8.4(d). Although Brennan conceded taking over some of James's cases without obtaining new retainer agreements, he denied any significant wrongdoing. At some point, not clear in the record now before us, the AGC Review Board found sufficient merit in Bar Counsel's complaint to issue Brennan a private reprimand.

On November 9, 1995, we denied James's exceptions to Judge McKee's findings and determined that James had never

actually served the one-year suspension ordered in December, 1993. We therefore ordered that James serve that suspension, commencing November 12, 1995.

In October, 1995, Linda Gunn, whom James had previously represented in other matters, called James in connection with some difficulties her son was facing. She was not aware that James was under suspension and was not informed of that fact. She and her husband went to James's office in Greenbelt on October 16 to discuss James's representation of the young man in the juvenile court matter. James was behind the desk in his office. At some point, Brennan, whom James introduced as his "associate," came in and remained throughout the 45–minute meeting as the case was discussed. Brennan was aware, of course, that James was not then authorized to practice law, and he was particularly aware that his involvement with James was currently, or had been, under scrutiny by Bar Counsel. James indicated that three hearings would be required and initially quoted a fee of $2,000 but eventually agreed to $1,500. Ms. Gunn wrote a check to "Al James" and gave it to James, who accepted it.

During the meeting, James indicated that, as a result of some experiences involving his own son, he was aware that social, job placement, or medical resources existed that might be helpful to young Gunn and would try to contact those resources. Ms. Gunn assumed that James and Brennan would be "working together" on the case, although she said that, at the time, she was not certain that Brennan was even a lawyer. Ms. Gunn said that, although James "would look into some resources for us," she believed that "when we were going to court, I assumed he was going to show up" and that Brennan was simply "helping him." As the Gunns were leaving, James said that either he or Brennan would attend the hearings. There was no discussion as to what part of the $1,500 fee belonged to Brennan, and no fee agreement was entered into between the Gunns and Brennan. James and Brennan later privately agreed that, of the $1,500 paid to James, $500 would be kept by him, as a fee, $1,000 would be paid, as a fee, to

Brennan, but James would retain $500 of Brennan's share as Brennan's contribution to rent.

On October 24, 1995, Brennan appeared on behalf of Ms. Gunn's son at a hearing before a Juvenile Court master. The Gunns were satisfied with the outcome and with the representation. Brennan informed them that the son would have to appear at a review hearing on November 15, 1995, and that he would attend as well. Ms. Gunn called James's office on November 14 to inquire about the hearing but was unable to reach either James or Brennan. Worse, Brennan did not appear at the hearing and, when attempts by the Gunns and the master to locate Brennan were unsuccessful, the hearing proceeded without him. Fortunately, because the lad had complied with the conditions imposed by the master, the disposition at the review hearing was favorable. Although Brennan acknowledged having promised to appear at the review hearing, he later concluded that his presence "really isn't necessary there." He never communicated that change of view to the Gunns.

On November 16, Ms. Gunn attempted, unsuccessfully, to reach Brennan, but she did speak with James, who promised to take the matter up with Brennan. After several further attempts to reach Brennan, all in vain, the Gunns filed a complaint with AGC. Only then did Brennan contact the Gunns, apologize for not having appeared, and return $1,000 of the $1,500 fee.

Upon those findings, Judge Rushworth found that, by failing to appear at the review hearing and failing to contact the Gunns following that non-appearance, Brennan violated MLRPC Rules 1.3 (A lawyer shall act with reasonable diligence and promptness in representing a client) and 1.4(a) (A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information). As noted, no exceptions were filed to those findings.

The charges under MLRPC Rules 5.4, 5.5, 8.1, and 8.4 arose more from Brennan's relationship with James than from his

representation of the Gunns. Rule 5.4(a) prohibits a lawyer from sharing legal fees with a non-lawyer, except as otherwise provided in that rule. Rule 5.5(b) prohibits a lawyer from assisting a person who is not a member of the bar in the performance of activity that constitutes the practice of law. AGC contended that the Gunns consulted James, believing him authorized to practice law, that Brennan, knowing that James was *not* authorized to practice law, permitted the Gunns to continue in their mistaken belief, that he, in fact, shared the $1,500 fee with James, and that he thereby assisted James, who was not then a member of the bar, to perform activity that constituted the practice of law. Brennan's defense to those charges was that James's participation was solely to investigate the prospect of getting the young Gunn into a treatment or job training program, which did not constitute the practice of law, and that his share of the fee was for that service. As to those issues, Judge Rushworth found:

"The evidence clearly and convincingly proves that the initial meeting was held as an initial consultation to discuss the possibility of representation and the legal fees. Additionally, the evidence clearly and convincingly proves that James offered to investigate the availability of a treatment center and job training program for the Gunns' son. The evidence also proves that during the initial consultation neither [Brennan] or James informed the Gunns that James was disbarred [*sic,* suspended]. Therefore, the Gunns could only have reasonably concluded that James was, in fact, licensed to practice law. However, the court cannot conclude, under the clear and convincing standard, that [Brennan] intended to misrepresent to the Gunns the status of James or that [Brennan] was attempting to assist James in the unauthorized practice of law. While James may have offered some legal advice to the Gunns during the initial consultation, the case was handled entirely by [Brennan] and James' involvement was solely limited to the investigation of a treatment center or job training for the minor Gunn. Although it is possible that [Brennan] did allow James to offer some legal advice to the Gunns about the

representation of their son, the evidence presented did not rise to the clear and convincing standard. Therefore, the court concludes that [Brennan] did not violate Rule 5.5. The court also concludes that the evidence simply does not rise to the clear and convincing standard to conclude that [Brennan] shared legal fees with James in violation of Rule 5.4."

Judge Rushworth then turned to the alleged violations of Rules 8.3 and 8.4. Rule 8.3(a) requires a lawyer having knowledge that another lawyer has committed a violation of MLRPC that raises a substantial question as to the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, to inform Bar Counsel. Rule 8.4(a) and (c) make it professional misconduct for a lawyer to violate MLRPC or knowingly assist another in doing so, and for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation. Notwithstanding the findings he had made with respect to Rules 5.4 and 5.5, Judge Rushworth concluded, as to Rules 8.3 and 8.4:

"The court concludes that there is clear and convincing evidence that [Brennan] violated Rule 8.3: James clearly misrepresented his status to the Gunns. Therefore, [Brennan] had an affirmative duty to report this conduct. The court also concludes that there is clear and convincing evidence to conclude that [Brennan] violated Rule 8.4(a) & (c). [Brennan] also violated Rule 8.3(a) by violating Rule 1.3, Rule 1.4.[1] The court also finds that [Brennan] violated Rule 8.4(c) by failing to clearly articulate to the Gunns that James was not licensed to practice law. Finally, the court cannot conclude that [Brennan] violated 8.4(d) because there was not clear and convincing evidence that [Brennan] 'engaged in conduct that [was] prejudicial to the administration of justice.' "

---

1. As AGC points out in its exceptions, Judge Rushworth apparently meant to refer to Rule 8.4(a), rather than 8.3(a).

## DISCUSSION

As noted, AGC has excepted to Judge Rushworth's findings regarding Rules 5.4, 5.5, and 8.1. It urges that those findings are clearly erroneous or legally incorrect in that the evidence clearly and convincingly demonstrated that James was, in fact, practicing law, with Brennan's assistance, and that the $500 retained by James as a fee did, indeed, constitute the improper sharing of a legal fee.

■ We start, as a base, with Judge Rushworth's finding that James "clearly misrepresented his status to the Gunns" and that, by not reporting that conduct to Bar Counsel and informing the Gunns that James was not authorized to practice law, Brennan violated MLRPC Rules 8.3 and 8.4(c). That necessarily supposes that James was at least pretending to practice law—holding himself out as practicing law—for, if that were not the case, there would be nothing to report to Bar Counsel and no need to correct any misunderstanding on the part of the Gunns. Judge Rushworth found clear and convincing evidence that the initial meeting was held to discuss representation and legal fees. The evidence is uncontradicted that the Gunns sought to employ *James,* not *Brennan,* as the lawyer for their son. They did not know Brennan and, as noted, were not even certain that he was a lawyer. James was behind the desk in his office; Brennan came in later and was introduced as James's "associate." The discussions appear to have been between the Gunns and James. James set the fee and accepted the check for that fee, made out to him. Although Brennan testified that he thought "it was made clear that [James] was going to be the individual who looked into the various programs . . . and that I was going to be the fellow who appeared in court," he did not contradict Ms. Gunn's testimony that James stated that either he or Brennan would appear at the hearing. Indeed, when asked on cross-examination whether it occurred to him that the Gunns might be looking upon James as their attorney in this situation, he acknowledged, "[c]ertainly in retrospect I think they did."

Judge Rushworth's conclusions as to Rules 5.4 and 5.5 seem to be based on a finding that, notwithstanding that James represented himself to be an attorney, acted as though he were an attorney, and led the Gunns to believe that he would be their attorney, because his role was eventually limited to exploring various job training or social/medical resources, which any layperson can do, he did not, in fact, practice law or take a fee for doing so. There are a number of factual and legal problems with that analysis.

According to Ms. Gunn, the reference to James searching for job training or medical services for her son was essentially an aside. She was looking for an attorney to represent her son at a juvenile court hearing, not someone to investigate job training or social service resources, and she expected James to show up at the hearing or at least to work together with Brennan on the case in that regard. James's actual contribution with respect to locating resources was, at best, minuscule. Brennan testified that James showed him a brochure from the Devereaux Institute, which James knew about from his own experiences, and "notes regarding the Job Corps branch in Laurel." Brennan never showed either one to the Gunns and never raised either prospect at the hearing. Nor, of course, were the Gunns ever apprised that any part of the $1,500 legal fee set by James was to be segregated for strictly non-legal work.

Most significant, from a factual point of view, is the lack of any evidence, other than Brennan's conclusory statement, that James was working for him as a paralegal or clerical employee. Nowhere in this record is there any testimony or other evidence that James was working under Brennan's supervision and direction, which such a relationship requires. *See Attorney Griev. Comm'n v. Hallmon*, 343 Md. 390, 681 A.2d 510 (1996). The most telling fact in this regard is that James introduced Brennan to the Gunns as his "associate," not his employer. The evidence indicated that the office was James's, it was designated as a law office, and Brennan merely used it sporadically for his own purposes, paying occasional rent to James for the privilege. In *Attorney Griev. Comm'n v.*

*James, supra,* 340 Md. 318, 666 A.2d 1246, we rejected James's contention that he was working only as Brennan's paralegal, largely because of James's extensive client contact and because proper fee arrangements had not been entered into between Brennan and James's clients, contrasting that situation from the one in *Matter of R.G.S.,* 312 Md. 626, 541 A.2d 977 (1988). The present case is even worse, for James is the one who held himself out to be a lawyer and who set and accepted the fee, all in Brennan's presence.

We tacitly recognized in *Matter of Murray,* 316 Md. 303, 558 A.2d 710 (1989) and explicitly recognized in *Attorney Griev. Comm'n v. James, supra,* 340 Md. 318, 666 A.2d 1246, that it is permissible for a disbarred or suspended lawyer to work as a paralegal, provided that proper procedures and constraints are in place to assure that the public in general, and clients in particular, are not confused as to the person's status as a paralegal. In *Matter of Contempt of DeLoney,* 689 N.E.2d 431, 433 (Ind.1997), the Indiana court observed:

> "A suspended or disbarred lawyer who has been disciplined may not continue simply to do 'business as usual,' keep mum about his or her discipline, and eliminate only those activities such as court appearances and signing of legal documents which might lead to being detected. A suspended or disbarred lawyer bears a heavy responsibility to guard against any misunderstanding about the lawyer's status and has an affirmative obligation to insure that the public understands that he or she is no longer a lawyer."

Some courts have gone so far as to preclude suspended or disbarred lawyers from performing certain activities that have a nexus to law practice, even though those activities do not themselves constitute the practice of law and a layperson could lawfully perform them, because observation of the suspended or disbarred lawyer performing those services could reasonably give the impression that the person is, in fact, continuing to practice law. *See Application of Christianson,* 215 N.W.2d 920, 925 (N.D.1974); *Matter of Frabizzio,* 508 A.2d 468, 469 (Del.1986). In *Nebraska State Bar Ass'n v. Butterfield,* 172 Neb. 645, 111 N.W.2d 543, 546 (1961), the

court made clear that "[a] suspended lawyer will not be heard to say that services recognized as within the practice of law were performed in some other capacity when he is called to account." *In accord: State v. Schumacher,* 214 Kan. 1, 519 P.2d 1116 (1974).

We have not gone so far as to rule categories of otherwise permissible conduct strictly off limits to suspended or disbarred lawyers. There are, indeed, certain activities that *may* properly be performed by suspended or disbarred lawyers, whether or not as part of a representation by a lawyer. Factual investigations, including the ascertainment of whether suitable medical, economic, or social resources exist that may be helpful to a client, may be undertaken by such persons. Indeed, if the Gunns were so inclined, they could have employed James for that purpose. The compelling fact here, however, is that they did not employ James to investigate available resources. They employed him as a lawyer. That kind of service, when undertaken in connection with legal representation, and especially when undertaken in connection with litigation, is commonly performed by or under the direction of lawyers as part of the representation, and thus becomes part of the practice of law. Unless the contrary is made very clear, the client and others will naturally assume that the lawyer is performing that service as part of the overall representation. In *Attorney Griev. Comm'n v. Hallmon, supra,* 343 Md. 390, 399, 681 A.2d 510, 515, citing *In re Opinion No. 24 of the Comm. on the Unauthorized Practice of Law,* 128 N.J. 114, 607 A.2d 962 (1992), we concluded that work performed by a paralegal *does* constitute the practice of law; whether it is the *unauthorized* practice of law depends on the extent to which it is supervised by the lawyer.

When viewed in this setting, it is clear that any private arrangement between Brennan and James assigning to James only the investigation of resources does not convert a sow's ear into a silk purse. James was employed as a lawyer; the services he supposedly was to perform were traditionally those performed by or under the direction of a lawyer; they were reasonably regarded by the Gunns as part of the legal repre-

sentation; and, under the circumstances, Brennan must have been aware that they would be so regarded. Judge Rushworth's conclusions that "there was no evidence presented that indicates James participated in any way with legal representation of the Gunns' son," that the evidence did not establish that Brennan "was attempting to assist James in the unauthorized practice of law," and that, as a result, there was no violation of Rule 5.5 are clearly erroneous and legally incorrect.

■ That alone would make Judge Rushworth's findings and conclusion as to Rule 5.4 equally erroneous. There is, however, a more direct error in his conclusion with respect to Rule 5.4. Even if James's role could properly be regarded as that of a paralegal, as we made clear in *Attorney Griev. Comm'n v. James, supra,* 340 Md. at 326, 666 A.2d at 1250, quoting from an opinion of the Maryland State Bar Association's Committee on Ethics, it "would be clearly impermissible" to share fees with a paralegal. We adopted the principle that "any arrangement, salary or otherwise, based on, or calculated from the fees of clients or otherwise tantamount to a draw, would be equally impermissible as long as it suggested that the title of paralegal or clerk merely covered up what was, in substance, a continuation of the practice of law." The $1,500 fee paid in this case—to James—was solely for legal representation, and it was therefore impermissible, and a violation of MLRPC Rule 5.4, for Brennan to share that fee with James, which is precisely what he did. The conduct establishing a violation of Rules 5.4 and 5.5 also establishes a violation of Rule 8.1.

■ This Court takes its role as the promulgator and guardian of proper standards for the practice of law seriously. Lawyers are not suspended or disbarred capriciously, for less than compelling reasons. When they are suspended or disbarred, they may not practice law except under the limited circumstances noted in *Hallmon, supra.* Members of the Maryland bar have their own duty under MLRPC not to assist suspended or disbarred lawyers in making a sham of the

suspension or disbarment. We take that duty equally seriously. The conduct engaged in by Brennan in this case warrants more than a reprimand. He shall stand suspended for 90 days, commencing 30 days after the Clerk mails a copy of this Opinion to him.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST EUGENE M. BRENNAN, JR.